AMERICAN CIVIL LIBERTIES UN-
ION/EASTERN MISSOURI FUND,
et al., Plaintiffs/Respondents,

v.

B. Stephen MILLER, III,
Defendant/Appellant.

No. 72837.

Supreme Court of Missouri,
En Banc.

Feb. 7, 1991.

Charles D. Sindel, Clayton, for defen-
dant-appellant.

Alan Kohn, St. Louis, for plaintiffs-re-
spondents.

RENDLEN, Judge.

The American Civil Liberties Union/East-
ern Missouri Fund (Fund), joined by Larry
Katzenstein and Joyce Armstrong, repre-
sentatives of the American Civil Liberties
Union, Eastern Missouri (ACLU), brought
this action against B. Stephen Miller, III
(Miller) to recover attorney's fees awarded
while he was employed as a staff attorney
for ACLU. Defendant appeals from the
trial court's order denying his summary
judgment motion and granting plaintiffs'
motion for similar relief. Following rever-
sal of the judgment in the court of appeals,
the cause was transferred because of the
general interest and importance of the is-
sue presented, and is determined as though
on original appeal. Mo. Const. art. V, § 10.
We reverse and remand.

Miller, a practicing attorney, was hired at a monthly salary as ACLU's first staff counsel in 1982. ACLU required that any attorneys' fees he received while so employed would be "handed over to the organization." In 1984 and 1985, a federal civil rights action styled *D.C. and M.S. v. City of St. Louis*, No. 84–1152 C(3), was tried in the Eastern District of Missouri. This action, sponsored by ACLU, challenged a City of St. Louis ordinance, and Miller, as ACLU staff counsel, with Arlene Zarembka as a "cooperating" or "volunteer" attorney, represented D.C. and M.S. ACLU's agreement with D.C. required it to provide legal services free of charge, and in exchange, D.C. promised that any court "award of fees or costs shall be paid in full to the ACLU immediately upon my receipt of such award."

D.C.'s challenge to the ordinance was successful, and in June, 1985, Miller and Zarembka filed a "Motion for Attorneys' Fees and Costs" on behalf of D.C. pursuant to 42 U.S.C. § 1988. That motion asked the district court to award D.C. (1) $35,765.00 for attorney fees based on services rendered by Miller and Zarembka and (2) $2,729.72 for costs advanced by ACLU.

On July 15, 1985, Miller resigned his position as ACLU staff counsel, effective August 23. On September 25, the district court ordered D.C.'s motion "granted so that [D.C.] is awarded $15,501.25 in reasonable attorneys' fees and $2,729.79 in reasonable costs." A memorandum accompanying the district court's order disclosed that the award was based on credit for Miller's work in the amount of $8,090.25 and Zarembka's with $7,411.00.

In early October, Miller contacted the City Counselor's office regarding the City's payment of attorney fees and costs pursuant to the district court's order. At his request, the City issued a separate check solely to Miller for $8,090.25 and a check for $2,729.79 to ACLU for costs.

ACLU demanded that Miller "hand over" the $8,090.25, asserting that Miller was contractually obligated so to do. Miller refused, insisting that such action would violate both the ethical prohibition against "fee-sharing" and § 484.150.1, RSMo 1986, but Miller offered to return to ACLU the proportion of his salary earned while working on the D.C. case. ACLU refused Miller's offer, and instead commenced this litigation to recover the $8,090.25, pleading alternatively: (1) contractual obligation; (2) conversion; and (3) unjust enrichment.[1] The trial court sustained ACLU's motion for summary judgment on all counts and denied Miller's cross-motion for summary judgment.

■ In its first count, ACLU alleged Miller failed to fulfill his contractual obligation to deliver all awards of attorneys' fees to the organization. Countering this charge, Miller maintains the trial court erred in "granting plaintiffs' motion for summary judgment and in denying the cross-motion for summary judgment filed by defendant, because the unassailable proof established that defendant was entitled to judgment as a matter of law in that ... Missouri public policy, Missouri statutory law and the canons of professional responsibility ... prohibited defendant ... from sharing with plaintiffs ... any fees he received in the practice of law or in doing law business."

Initially, we note that "it is no longer necessary to support a motion for summary judgment by 'unassailable proof.' " *Defino v. Civic Center Corp.*, 780 S.W.2d 665, 667 (Mo.App.1989). Summary judgment "shall be entered forthwith if the plead-

---

1. It should be emphasized that ACLU made no claim in its petition for return of any portion of the salary paid defendant; such was not an issue and was not decided in this case. Further, as noted above, appellant offered to refund a proportional share of the salary, but ACLU refused this offer and the issue fell from consideration. ACLU chose to plead and try an entirely different claim, attempting to enforce an illegal contract for fee-splitting. It was concerned not with recovering the salary paid but instead to enforce the illegal contract and in so doing abrogate the long-established rules of our profession which proscribe this condemned practice of lawyers splitting fees with nonlawyers. Further, the decision does not determine the so-called "ethical conduct" of appellant to which the dissent alludes, or any issue as to possible disputes between appellant and D.C. (or others) concerning the award of fees.

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 74.04(c).

The parties agree that there is no genuine issue of material fact; accordingly, our review is limited to determining whether, as between these parties, Miller was entitled to a judgment as a matter of law. It should be emphasized that, although the federal court's award was to D.C., he is not a party to this action, and therefore his right, if any, to the $8,090.25 is not here for consideration.

This brings us to an examination of the statutory and ethical prohibitions against fee-splitting. Section 484.150.1, RSMo 1986, provides:

> It shall be *unlawful* for any licensed attorney in the state of Missouri *to divide any fees* or compensation received by him in the practice of law or in doing law business *with* any person not a licensed attorney or any firm not wholly composed of licensed attorneys, or *any association* or corporation, and *any person,* firm, association or corporation *violating this section shall be deemed guilty of a misdemeanor* and upon conviction therefor shall be punished by a fine of not less than twenty-five dollars nor more than five hundred dollars and costs of prosecution, which fine shall be paid into the treasury of the state of Missouri.

(Emphasis added.) Further, Disciplinary Rule 3–102, in effect at the time of the fee award at issue here, provided, with certain exceptions not applicable in this case, that "[a] lawyer or law firm shall not share legal fees with a non-lawyer." [2]

Though there is little Missouri authority construing this statute or the rule, without question they apply to the situation at bar. The Advisory Committee of the Missouri Bar Administration has so opined, stating in a letter of December 31, 1985, that "[i]t is the Committee's opinion that a staff attorney who is on salary to the American Civil Liberties Union and who is awarded attorneys fees cannot turn said fees over to the corporation." [3] This Court in *State ex rel. McKittrick v. C.S. Dudley & Co.,* 340 Mo. 852, 102 S.W.2d 895, 901 (1937), noted that "[t]he public policy of this state as shown by the ... statute prohibits the splitting of fees between an attorney and a lay agency." In a closely analogous situation, Missouri Bar Opinion No. 43 declared it impermissible for an attorney employed by a corporation on a salaried basis to request attorneys' fees when it was understood that the corporation desired the fee for its own use.

ACLU, however, relying on *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) and *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), urges we hold that application of the fee-splitting prohibitions to its organization would infringe its First Amendment rights. In *Button,* the United States Supreme Court held Virginia violated the First Amendment freedom of expression in *prohibiting* NAACP staff attorneys from *soliciting* prospective civil rights litigants and referring them to the NAACP legal staff. 83 S.Ct. 328. In *Primus,* 98 S.Ct. 1893, the Court similarly held South Carolina could not sanction a lawyer affiliated with the ACLU for *informing* a prospective civil rights litigant that legal assistance was available from ACLU. Though the State must tailor regulation so as not to abridge the associational freedom of nonprofit organizations such as the ACLU, *id.* 98 S.Ct. at 1908, the prohibition against fee-splitting does not infringe upon First Amendment rights so as to violate the Constitution. Indeed, a scholarly article by ACLU's trial counsel in this case concedes that "the Supreme Court has never ex-

---

2. Current Rule 5.4 contains identical language. Exceptions in both rules, not applicable here, involve payments to a lawyer's estate or inclusion of non-attorney employees in a retirement plan, even though based on profit-sharing.

3. We note that some states have reached a contrary determination. *See* Simon, *Fee Sharing with Nonlawyers,* 98 Yale L.J. 1069, 1073 n. 14 (1989).

pressly extended First Amendment protection to fee-sharing arrangements with non-profit groups." Simon, *Fee Sharing with Nonlawyers*, 98 Yale L.J. at 1121. Though the article presents the author's policy arguments why the fee-splitting prohibition should not be applied to public interest groups, we find no constitutional authority to strike down the firm policy of our state as declared by the legislature and by this Court in its rule against fee-splitting.

Assuming *arguendo* that Miller had a binding contractual obligation to return the fees to ACLU, we hold such agreement is unenforceable and ACLU's first count must fail. *See Faygal v. Shelter Insurance Co.*, 689 S.W.2d 724, 727 (Mo.App. 1985).

■ ACLU's second count, an action for conversion of the proceeds, fails for the simple reason that it had no enforceable right in the property. "In Missouri, in order to maintain a suit for conversion, the plaintiff must have title to, or a right of property in, and a right to the immediate possession of the property concerned at the time of conversion." *Twellman v. Lindell Trust Co.*, 534 S.W.2d 83, 97 (Mo.App. 1976); *see also Brede Decorating, Inc. v. Jefferson Bank & Trust Co.*, 345 S.W.2d 156, 164 (Mo.1961). There is no genuine issue of material fact as to this essential element.

■ The third count alleges unjust enrichment, which occurs "where a benefit is conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust." *Erslon v. Vee–Jay Cement Contracting Co.*, 728 S.W.2d 711, 713 (Mo. App.1987). An essential element of this tort is "a benefit conferred upon the defendant by the plaintiff." *Id.* Again, ACLU fails to establish the required element, for as previously discussed, it had no right to the fees and thus conferred no benefit on Miller. The court awarded the attorneys'

fees on behalf of D.C., the plaintiff in the civil rights action, thus it cannot be said that Miller received the money at the expense of ACLU. In this connection we point out that D.C. is not a party to this action and we insinuate nothing as to his rights to the proceeds.[4]

The trial court erred in granting summary judgment in plaintiffs' favor on each of the three counts. Miller was entitled to summary judgment as a matter of law on all counts, hence the judgment is reversed and the cause remanded for further proceedings consistent with this opinion. Miller's request for an award of costs is denied.

HIGGINS, COVINGTON, BILLINGS and HOLSTEIN, JJ., concur.

ROBERTSON, J., dissents.

BLACKMAR, C.J., dissents in separate opinion filed.

BLACKMAR, Chief Justice, dissenting.

The principal opinion condones the conduct of a lawyer in taking unto himself monies which he had agreed he would pay over to his employer. It frustrates the policy of federal statutes providing for the award of attorneys' fees so as to make it possible for impecunious litigants to maintain statutory actions for the vindication of their civil rights. It does this by means of an unwarranted construction of state statutes and court rules designed to keep laypeople from making a profit from the law business and not at all to prevent nonprofit agencies which sponsor litigation in which they have no economic interest from recouping their actual outlays for salaries paid to their attorneys, in the rare cases in which fees are awarded. If our statutes and rules preclude the arrangement the defendant attorney bound himself to, they are at war with the express policy of the federal statutes providing for the recovery of attorneys' fees under the civil rights

---

4. The parties attempt to make an issue of whether the fees were awarded to D.C. or to Miller. Although the order of the federal district court expressly awarded the fee to D.C., as is required by federal statute, it is manifestly clear that the award is intended to compensate the attorney representing him, and the City of St. Louis issued the check to Miller according to its standard procedure in such matters.

statutes,[1] and therefore must give way under the supremacy clause.

### 1. *The Defendant's Employment*

The plaintiff American Civil Liberties Union, Eastern Missouri (ACLU/EM), is a not-for-profit membership association. Its purposes include "nurturing civil liberties and promoting or opposing legislation affecting civil liberties."[2]

ACLU/EM fosters and finances litigation in pursuit of its civil liberties objectives, as it conceives them. Cases are often filed on behalf of individual clients under statutes passed pursuant to the enabling provisions of the Fourteenth Amendment. These statutes provide remedies to implement the rights guaranteed by that amendment, thereby making use of our honored adversary process in the pursuit of constitutional and statutory rights. It makes no difference that some might deem this goal unworthy, the underlying statutes unwise, or the aims of a particular lawsuit trifling or pestiferous. Those who think they have rights are entitled to their day in court. Those in opposition may be heard in the same forum. That is the way our legal system works.

Prior to 1982 ACLU/EM had no full time lawyer on its payroll. In that year the defendant, a recent graduate of a leading law school, was hired as its first full-time staff counsel at a salary comparable to the prevailing rate for new lawyers in the St. Louis area. He understood from the beginning of his employment that he was not to receive fees from litigants in the cases that he handled in litigation sponsored by his employer and that any court awards of attorneys' fees on account of his services were to be paid over to ACLU/EM. He continued in this employment until 1985.

1. *The Civil Rights Act of 1870,* 42 U.S.C. § 1981, *The Civil Rights Act of 1871,* 42 U.S.C. § 1983, *Act of July 31, 1861,* 42 U.S.C. § 1985, *Act of April 20, 1871,* 42 U.S.C. § 1986, *The Civil Rights Act of 1964,* 42 U.S.C. § 2000d, 20 U.S.C.S. § 1681. *See also, Marek v. Chesney,* 473 U.S. 1, 43–51 (1985) (appendix to Brennan, J., dissenting).

2. The plaintiff American Civil Liberties Union/Eastern Missouri Fund (ACLU Fund) is a

### 2. *The Litigation Giving Rise to the Fee Award*

In 1984 ACLU/EM undertook the sponsorship of an action on behalf of one D.C. against the City of St. Louis and other defendants in the United States District Court for the Eastern District of Missouri. Jurisdiction was invoked under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983. The suit challenged the city's "masquerading" ordinance, punishing a person who appeared in public "in a dress not belonging to his or her sex ... ."

The plaintiff signed a "retainer agreement" in which he stated that he sought the services of ACLU/EM in the pursuit of his legal objectives. The provisions of the agreement are important in showing the nature of ACLU/EM'S involvement the client's understanding, and compliance with appropriate rules governing legal ethics, and so I quote pertinent provisions as follows:

\* \* \* \* \* \*

I understand that I am represented by the lawyer named above, although the ACLU/EM is sponsoring my case.

\* \* \* \* \* \*

The services of the lawyer will be provided to me free of charge.

If my case is successful, the court may require the opponents to pay attorneys' fees and costs. I agree that any such award of fees or costs shall be paid in full to the ACLU/EM immediately upon my receipt of such award. ACLU/EM and I agree that I will retain any damages awarded to me after ACLU/EM is reimbursed for any costs not awarded to it by the court.

\* \* \* \* \* \*

Missouri not-for-profit corporation whose purposes include the "nurturing of civil liberties." It apparently exists as a fund raising medium with the monies raised being used to finance litigation sponsored by ACLU/EM. The present litigation was commenced by ACLU Fund, but ACLU/EM was made a party at the instance of the defendant. There is no dispute between the named plaintiffs, and we may treat their interests as identical.

I also understand that I am free at any time to discharge the lawyer representing me (subject to court approval). However, if I choose to discharge my lawyer, the ACLU/EM is under no obligation to find a replacement or to continue its sponsorship of my case. Continued ACLU involvement in my case will be determined after consideration of all the circumstances that may exist at the time.

The agreement listed the lawyer selected by ACLU/EM as "Ms. Arlene Zarembka," an attorney in private practice in St. Louis. The defendant was later instructed by his employer to participate in the suit along with Ms. Zarembka. He signed the pleadings along with Zarembka, styling himself "Staff Counsel, ACLU/EM."

The litigation resulted in a judgment declaring the ordinance invalid. There was no monetary award. The defendant and Zarembka then prepared an application for attorneys' fees as authorized by 42 U.S.C. § 1988,[3] setting out the hours involved in detail. Before the application was ruled on, however, the defendant had resigned his employment with ACLU/EM in order to accept a judicial clerkship. He withdrew as counsel for the federal plaintiff and the fee application was pursued by Zarembka. The court sustained the application for an amount substantially less than the request. Its order stated that "plaintiff is awarded $15,501.25 in attorneys' fees and $2729.79 in reasonable costs." In an accompanying memorandum the court stated that $7411. was awarded for Zarembka's services and $8,090.25 for the defendant's.

The defendant then prevailed upon the City Counselor's office to procure a check payable to him for the portion of the award computed on the basis of his services. He did this without advising or seeking the assent either of his client or of his former employer.

### 3. *The Defendant's Dishonorable Conduct*

The defendant was quite willing to accept his regular paycheck from ACLU/EM for three years. He clearly understood that he was not to derive individual remuneration from the clients furnished him by his employer. This is a perfectly lawful arrangement, similar to the understanding that associates in law firms and lawyers employed by corporations often have. It was clear that his employer had no purpose of supplying clients to the defendant so that he could augment his salary.

The defendant worked on several cases in which fees were awarded for his services. In some of these he himself turned the fee awards over to his employer; in at least one other the award, part of which was based on the defendant's services, was turned over by his co-counsel without apparent protest by him. No doubt his employment would have been terminated had he undertaken to avail himself of the proceeds of fee awards while continuing on the payroll.

By the time the fee award in the D.C. case was decreed the defendant had resigned his employment, and so had no worries about being fired.[4] The award was in favor of the plaintiff in the federal case. The governing statute provides that fees may be recovered by the "prevailing party." Nothing in the judgment authorized the defendant to help himself to any part of the proceeds of the fee. He knew that his client had bound himself to pay over any fee award to ACLU/EM.[5] He necessarily knew of his own contractual obligation. He admits that he did not tell either his client or his employer what he had done. This conduct speaks for itself.

---

**3.** Standards developed for § 1988 awards "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983).

**4.** I cannot understand the statement in the principal opinion that ACLU/EM did not "confer a

benefit" on the defendant. It put him in a position in which he was able to abstract the fee, and so he was unjustly enriched.

**5.** There is absolutely no reason why the client could not honor this commitment, given the opportunity.

The defendant now protests that he was afraid he might be subject to disciplinary action if he were to turn the proceeds over to his employer, as he had bound himself to do. He could have solved his professed dilemma easily by bringing an action of interpleader pursuant to our Rule 52.07. This is the much preferred course for one who comes into possession of funds that others may claim. The defendant did not have to help himself to the money in order to secure a determination of the governing legal considerations. He seems to operate under the maxim that possession is nine points of law.

### 4. Federal Statutory Policy

42 U.S.C. § 1988 provides that, in actions under certain civil rights statutes including 42 U.S.C. § 1983, under which the federal suit was brought

> the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as a part of the costs.

This statute has the purpose of assisting persons who have claim of violation of constitutional rights to advance their claims through litigation. Congress was aware that people often lack the means for obtaining legal assistance to vindicate their rights in court, and it responded by permitting fee awards to successful litigants. The fee award statute represents a national policy which we should respect.[6]

One of the purposes of ACLU/EM is to sponsor statutory actions to establish civil rights.[7] By providing the services of a salaried staff attorney, ACLU/EM may make it possible for agreeable but impecunious litigants to commence suit without a monetary advance. This arrangement serves the policy of the underlying federal statutes and is perfectly consistent with every ethical standard of the legal profession.

42 U.S.C. § 1988 provides that fee awards are to be made to "the prevailing party." It is manifest, however, that the purpose of the award is to permit the prevailing party to fulfill express or implied obligations for legal services. Courts construing this section have never hesitated to make awards in favor of organizations such as ACLU/EM, which sponsor litigation for the enforcement of constitutional rights.[8] Cases are legion in which awards

---

6. "Congress endorsed ... decisions allowing fees to public interest groups when it was considering and passed [section 1988]." *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 70 n. 9, 100 S.Ct. 2024, 2034 n. 9, 64 L.Ed.2d 723 (1980).

The principal purpose of § 1988 was to increase the availability of lawyers taking civil rights cases, to ensure "effective access to the judicial process." H.R.Rep. No. 1558, 94th Cong., 2d Sess. 3, 8 n. 16 (1976).

7. *See also Palmigiano v. Garrahy*, 616 F.2d 598 (1st Cir.) (National Prison Project) *cert. denied* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980); *Mary & Crystal v. Ramsden*, 635 F.2d 590 (7th Cir.1980) (Youth Policy and Law Center); Encyclopedia of Associations (22d ed. 1988).

Public interest organizations purport varied purposes. *See Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (adopting the position of the Pacific Legal Foundation, upholding the government's exemption shielding coal reserve developers from environmental impact statements); *Sierra Club v. Watt*, 659 F.2d 203 (D.C.Cir.1981) (the Mountain States Legal Foundation was successful in precluding the Sierra Club from interfering with established water rights); *Edwards v. Carter*, 445 F.Supp. 1279 (D.D.C.), *affirmed* 580 F.2d 1055

(D.C.Cir.), *cert. denied* 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978) (the Washington Legal Foundation attempted to stop President Carter from terminating a treaty without congressional participation). *See* O'Connor and Epstein, *Rebalancing the Scales of Justice: Assessment of Public Interest Law*, 7 Harv.J.L. & Pub. Pol'y 483 (1984).

8. *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989) ("That a nonprofit legal services organization may contractually have agreed not to charge *any* fee of a civil rights plaintiff does not preclude the award of a reasonable fee to a prevailing party in a § 1983 action, calculated in the usual way."); *McKenzie v. Kennickell*, 875 F.2d 330, 333–34, *reh. denied*, en banc, 884 F.2d 1405 (D.C.Cir.1989) (Distinguishing between private counsel and nonprofit organizations would "subvert the congressional intent that fee shifting statutes should benefit nonprofits."); *Ramos v. Lamm*, 713 F.2d 546, 552 (10th Cir.1983) ("Section 1988 contemplates that both public interest lawyers and private law firms be provided with incentive to prosecute civil rights actions; the fee awards provide this incentive by increasing the ability and willingness of both groups to finance litigation they would otherwise be unable or unwilling to af-

have been made for the services of salaried attorneys when all concerned clearly understand that the award will be paid over to the employer. I have seen no case in which the court awarding the fees has suggested that there is the least impropriety in so doing. However the decree awarding fees is phrased, ACLU/EM is an eligible recipient for a fee award under the federal statute. There is absolutely no support in the cases for the statement in the principal opinion that the statute was intended to "compensate the attorney representing him" without regard to the attorney's contractual obligations.

ACLU/EM's connection with the federal case was manifest in the pleadings. I am sure that the court awarding the fees fully expected that the portion awarded on account of the defendant's services would be paid over to his employer, and considered that such payments would be consistent both with the governing law and with established ethical standards. Such an understanding would accord with the uniform course of decision. I am confident that the federal judge would be as shocked as I am at the defendant's having converted the proceeds to his own use. He necessarily assumed that all involved would comply with their contractual obligations, and that he did not have to police the distribution of the proceeds.

### 5. Our Statutes and Rules

Section 484.160, RSMo 1986, was adopted in 1915.[9] It was clearly designed to apply to fees earned in the ordinary course of the private practice of the law and to support the salutary principle, found in almost all codes of professional conduct, that a person who is not a lawyer cannot appropriately share in the profits of the practice of law. It also gives some assurance that law business will go to the lawyer with the best reputation instead of to the one with the fastest runners. The statute, indeed, did

not establish new standards of professional conduct. It rather provided a criminal sanction for violation of long-recognized professional standards. The few cases construing the statute make its purpose clear. *State ex rel. McKittrick v. C.S. Dudley and Co.*, 340 Mo. 852, 102 S.W.2d 895, *cert. denied*, 302 U.S. 693, 58 S.Ct. 12, 82 L.Ed. 535 (1937), dealt with a corporation engaged in bill collection which referred claims to lawyers when it was unable to effect collection. We held that a lawyer retained by the agency could not pay over to it a portion of the fee charged for obtaining and collecting judgments.

The statute should be construed in the setting in which it was adopted and in the light of its purpose. Because it is a criminal statute the rule of strict construction should apply. Its obvious purpose is to restrict earnings from the practice of law to licensed lawyers. The words, "fees and other compensation received by him in the practice of law," necessarily refer only to sums received by a lawyer under an express or implied contract for compensation, and to awards of fees directly to a lawyer, as is usual in probate matters and some others.

In this case the fees ordered by the federal court were not awarded to the lawyer, nor was it contemplated by the court that the defendant would receive them personally. They were awarded to the federal plaintiff to enable him to discharge his legal obligations which, in this case, included the obligation to pay the award to ACLU/EM. The defendant got possession of the money only by self-help. He would not violate the statute by suffering the payment of the award fees in the manner that both he and the client had agreed to.

This case differs substantially from any other case our courts have dealt with. ACLU/EM paid the defendant a salary and underwrote the additional expenses which

ford."); *Palmigiano v. Garrahy*, 616 F.2d 598, 601–02 (1st Cir.1980) (awarding fees to the National Prison Project) *citing Reynolds v. Coomey*, 567 F.2d 1166, 1166–67 (1st Cir.1978) (awarding fees to the NAACP Legal Defense Fund); *Oldham v. Ehrlich*, 617 F.2d 163, 168–9 (8th Cir.

1980); *New York State Ass'n For Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1154 (2nd Cir.1983).

**9.** *See also Canons of Professional Ethics*, Canon 34 (1928).

are necessary in the practice of law. The record shows that the fees awarded for the defendant's services during the course of his employment are far less than the salary paid him. There is no indication whatsoever that the association derived a profit from the lawyer's services.[10] The record also shows that, throughout the period of the plaintiff's employment, he was his employer's first and only salaried staff counsel. Nothing in the statute or the canons of ethics would preclude reimbursement for salary and expenses of an employed lawyer.

The principal opinion, lacking any supporting judicial authority whatsoever, refers to opinions of the Advisory Committee of the Missouri Bar. Our Rule 5.06 authorizes the Advisory Committee to promulgate formal opinions, which are required to be published in the Journal of the Missouri Bar. Under the reasoning of *Gershman Invest. Corp. v. Danforth*, 517 S.W.2d 33 (Mo. banc 1974),[11] these opinions are simply opinions, entitled to no more weight as authority than the opinion of any other competent lawyer. The particular "opinion" which the defendant and the principal opinion adduce was not even promulgated in accordance with the requirements of Rule 5.06. It is simply a letter from the General Chairman expressing his views. His conclusion is tentative, as he professes willingness to examine pertinent federal authorities. Myriad federal authorities conflict with his informal opinion.

Thus the "firm policy of our state" which the principal opinion perceives vanishes into thin air. It is simply an invention of the writer utterly unsupported by authority. Nor is any reason given for the conclusion, other than the principal opinion's warped construction of the statute. There is no policy of our law which requires a judgment in favor of the defendant in this case. The principal opinion meekly concedes that "some states have reached a contrary determination." The fact is that not a single decision from any state supports the result reached by the majority.

The absence of authority elsewhere is significant. The principles of legal ethics are substantially the same in all American jurisdictions and, indeed, in all common law jurisdictions. The statute relied on in the principal opinion was passed to effectuate the prevailing standards. Many of the opinions supporting recovery of fees by organizations similar to ACLU/EM were written or participated in by judges of outstanding reputation, who were perfectly familiar with prevailing standards of legal ethics. Claims of unethical conduct and "fee splitting" were made in these cases with recurring monotony, and emphatically rejected. It would be the height of arrogance for our Court to suggest that it is more sensitive to ethical considerations than our judicial contemporaries might be.

The practice of awarding fees to sponsoring organizations simply did not exist when § 484.160 was enacted. It is not literally applicable to the present situation and its application is not necessary to serve any underlying policy. Because of the problems under the supremacy clause, the Court should reach a construction which is not subversive of the policy of the federal law.

### 6. *Conflict with Federal Policy?*

The principal opinion then takes up the respondents' argument relating to the federal constitutional and statutory policies implicit in 42 U.S.C. § 1988. Just as defendant's counsel does, it trumpets the statement in an article by the plaintiffs' trial counsel, Simon, *Fee Sharing Between Lawyers and Public Interest Groups*, 98 Yale L.J. 1069 (1989) that "the Supreme Court has never expressly extended First Amendment protection to fee-sharing arrangements with nonprofit groups." I should think that our purpose would be to determine what is right and proper under the laws of the United States and of our state,

---

**10.** Those of us with experience in private practice know that the expenses of attorneys invariably consume one-third to one-half of the gross.

**11.** This case, dealing with opinions of the Attorney General issued pursuant to § 362.195, RSMo 1986, dealt with an opinion prepared by the present writer.

and not to move only when we are prodded from above. Be that as it may, the fair intendment of *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) and *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) clearly supports the plaintiff's position. The conclusion of the principal opinion impedes the policy underlying 42 U.S.C. § 1988. The Supreme Court of the United States has regularly struck down state statutes or rules governing the legal profession when they conflict with federal law.[12] We should construe our statutes and rules in a manner consistent with the federal constitution and statutes.[13] Otherwise we transgress the supremacy clause.

*NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), recognized, perhaps to the surprise of many in the private bar, that litigation of issues within the ambit of the bill of rights and the equal protection clause is a form of political expression and association which is entitled to First Amendment protection against infringing state action. The National Association for the Advancement of Colored People engaged in the kinds of activities one might gather from its name. It maintained a staff of salaried attorneys who prosecuted suits on behalf of those who claimed to be victims of racial discrimination. Its representatives sought to get in touch with potential victims of discrimination to determine their possible availability as plaintiffs. The state court held that this conduct violated ethical rules against solicitation of lawsuits. The Supreme Court said that the state could not impose these rules as a barrier to the pursuit of antidiscrimination actions. The Court observed that the state

rules were designed to protect the public against predatory lawyers acting for their own economic benefit, and that their application to the activities of NAACP was not necessary to serve any proper state purpose.

In later cases (cited in footnote 12) the Court has made it clear that rules of professional conduct inhibiting behavior variously described as champerty, maintenance, or barratry could not be applied beyond their legitimate purpose so as to impede First Amendment rights. The most recent case is *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), in which a state sought to discipline an attorney who wrote to a litigant who had been sterilized in a possibly unconstitutional manner, advising her of the availability of a public interest organization to assist her in the pursuit of her constitutional claim. The attorney did not stand to recover a fee in the action. The Court stressed the absence of economic motivation on the part of the lawyer and the organization, and held that the solicitation represented protected speech which had been infringed by the inhibitory state regulation. It distinguished *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 *reh. denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978), decided the same day, which held that the state could discipline lawyers who personally solicited accident victims in hospital beds.

There is no principle that fee awards under that statute must go to the attorney who renders the services, when the attorney is hired for the purpose of maintaining civil rights lawsuits and paid a regular salary.[14] The principal opinion enunciates

12. *United Transp. Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971) (labor union may recommend specific attorneys to its members and limit their fees); *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (labor union has First Amendment right to hire attorneys to serve its members in their individual cases); *Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar,* 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89, *reh. denied* 377 U.S. 960, 84 S.Ct. 1625, 12 L.Ed.2d 505 (1964) (labor union has right to recommend specific attorneys to its injured members).

13. As has been shown previously, it is not necessary to declare either § 484.150.1, former DR 3–102, or current Rule 5.4 unconstitutional, to reach a holding consistent with federal law. It is sufficient to hold that they do not apply, for the reasons outlined in the preceding section.

14. *Howard v. Phelps,* 443 F.Supp. 374, 377 (E.D. La.1978) ("... it is plain that the ... American Civil Liberties Union should receive the fees generated by [the lawyer's] services up to the date he was no longer employed by them....").

no state interest, compelling or otherwise, which justifies our Court in setting itself in opposition to the policy and principle of the federal statutes. There is no doubt that our action makes organizations, of whatever hue of the political spectrum, which sponsor civil rights litigation less able to serve their constituencies than are like organizations in other states. Sections 1983 and 1988, therefore, operate less effectively in Missouri than in other states. This situation is at war with the supremacy clause.

Under *Button* and *Primus* those who are interested in the cause of men who want to appear on the streets of Clayton in women's clothes have the first amendment right to advocate their position by litigation, and to solicit potential plaintiffs to this end. The First Amendment is applicable to the states because it is incorporated into the fourteenth. *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). 42 U.S.C. §§ 1983 and 1988, the latter providing for attorneys fees, are statutes passed to implement the fourteenth amendment, under the express authority of section 5 of that article, and therefore to implement the first amendment rights recognized by *Button* and *Primus*. A state statute or policy which interferes with the operation of federal statutes implementing the fourteenth amendment must necessarily fall under the supremacy clause of Article VI.

My conclusion is consistent with the recent opinion of Judge Scott O. Wright of the United States District Court for the Western District of Missouri, in which he finds a violation of the supremacy clause in the attempt of the state of Missouri to recoup the cost of incarceration out of awards of punitive damages to prisoners under 42 U.S.C. 1983. *Hankins v. Finnel*, No. 88–4094, slip op. at 8, 11–12 (W.D.Mo. Jan. 28, 1991). The judge holds that the state action thwarts the policy of the federal statute, which has as its purpose the discouragement of violations by prison employees. *Id.*

Here the interference is patent. If the plaintiffs are entitled to recover the fees awarded for the services of their staff attorneys, they may be able to continue and expand the hiring of staff attorneys, so as better to serve the litigants Congress wants to encourage them to assist.

It might help to consider the economics of the arrangement in more detail. Fees under § 1988 are manifestly contingent, available only to a "prevailing party." [15] They differ from the usual contingent fee arrangements which are usual in personal injury litigation in that they must be based on hourly computations and prevailing hourly rates rather than on a percentage of recovery. Many civil rights cases, such as this one, cannot be valued monetarily. So it is much more difficult for the civil rights lawyer than for the personal injury lawyer to make up for losses by wins. For this reason, a civil rights action may be less attractive than a damage suit to a private practitioner.[16] Some will decline contingent actions of this kind and others may be forced to limit their intake. An organization which provides a salaried lawyer, therefore, serves a salutary purpose. This Court's decision, then, makes it more difficult for civil rights claimants to get the legal representation the federal statutes seek to assist them in getting. This is the necessary effect, and therefore the intent, of the principal opinion.

If the defendant's position is upheld his employer could only operate as a procurement agency for his law practice, subsidizing unsuccessful actions without being able to recoup in successful ones. It is neither necessary nor desirable to place it in such a position. The arrangement under which the defendant was hired is perfectly legitimate.

The defendant suggests that ACLU/EM is not eligible for a fee award because its

---

**15.** *See, e.g., Texas State Teachers Ass'n. v. Garland Indep. School Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 1489, 103 L.Ed.2d 866 (1989); *Fast v. School Dist. of City of Ladue,* 728 F.2d 1030 (8th Cir.1984).

**16.** *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 401–02, 88 S.Ct. 964, 965–66, 19 L.Ed.2d 1263 (1968). *See also* footnote 8, *supra.*

governing board includes non-lawyers. Dozens of cases sanction fee awards to similar organizations.[17] There is no obstacle to awarding fees to organizations such as the plaintiff based on prevailing market rates. Nor is there any authority for reducing the portion of the fee award the plaintiffs can recover because of the nature of ACLU/EM. In *Blum v. Stenson*, 465 U.S. 886, 894, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1983),[18] the Court stated:

> It is also clear from legislative history that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization.[19]

The retainer agreement makes it clear that the lawyer represents only the client, and thus the client is free to discharge the lawyer at any time. The defendant surely does not suggest that his management of this case was the subject of improper outside interference. Nor is there any indication that any case sponsored by the plaintiffs was handled other than in accordance with the highest professional standards. If problems arise in future cases the disciplinary arm should be adequate.

### 7. *Summary Judgment for Defendant*

Even if the Court is of the opinion that summary judgment for the plaintiff was improvident, the summary judgment for the defendant violates established procedural standards. The Court sums up its rationale in a footnote (No. 1) which is noteworthy in that it contains more misstatements of established procedural law than I have ever seen in such a confined space. I particularize.

The fundamental error, perhaps, is highlighted in the statements about what the plaintiff "chose to plead and try." There of course was no trial.

Next, the summary judgment for the defendant is jurisdictionally flawed under the ten-day provision of Rule 74.04(c). The defendant's opposing affidavit, filed on the day of the hearing, could properly be received in opposition to the plaintiffs' motion, but it cannot support the motion of the defendant. The ten-day provision is mandatory. *Joachim Sav. & Loan Ass'n v. State Farm Fire and Cas. Co.*, 764 S.W.2d 648, 650 (Mo.App.1988).

The reason for the ten-day provision is that the trial court has great discretion in the processing of summary judgment. The trial court is not obliged to accept the statements in affidavits, even though they are not explicitly controverted. Affidavits and other materials presented on behalf of the moving party are strictly construed. Rule

---

17. *Love v. Mayor, City of Cheyenne, Wyo.*, 620 F.2d 235, 237 (10th Cir.1980) ("It is well settled that the ACLU is entitled to an award of attorney's fees under § 1988"); *McLean v. Arkansas Bd. of Educ.*, 723 F.2d 45, 48–49 (8th Cir.1983) ("Fee awards ultimately benefiting legal services organizations, over and above their general or specific fund-raising efforts, help to insure the continued existence of such organizations and their ability to represent other indigent parties who cannot afford private legal representation."); *Rodriquez v. Taylor*, 569 F.2d 1231, 1245 (3rd Cir.1977) *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978) ("The award of fees to legal aid offices and other groups furnishing *pro bono publico* representation promotes the enforcement of the underlying statutes as much as an award to privately retained counsel. Legal services organizations often must ration their limited resources. Allowing them to recover fees enhances their capabilities to assist in the enforcement of congressionally favored individual rights."); *Lund v. Affleck*, 587 F.2d 75, 76 (1st Cir.1978) (legal services organizations may recover fees under § 1988).

18. The Legal Aid Society of New York, whose governing board includes non-lawyers, represented the plaintiff in this case.

19. This holding refutes the defendant's use of *National Treasury Emp. Union v. United States*, 656 F.2d 848 (D.C.Cir.1981), which the defendant makes much. It is hard to see how this case helps him, because it clearly sanctioned reimbursement to the attorneys' employer. The organization involved, furthermore, existed for the economic benefit of its members. The rule of that case has never been applied to an organization such as the plaintiff. Moreover, the D.C. Circuit in *McKenzie v. Kennickell*, 875 F.2d 330, 333–34, *reh. denied*, en banc, 884 F.2d 1405 (D.C.Circuit 1989), held that distinguishing between private counsel and nonprofit organizations would "subvert the congressional intent that fee shifting statutes should benefit nonprofits."

74.04(e) provides that the trial court may "permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." The trial court had no occasion to tender the plaintiffs this opportunity, insofar as the defendant's motion is concerned, because it was of the opinion that the plaintiffs were the parties entitled to summary judgment. *See Noll v. Shelter Ins. Co.*, 774 S.W.2d 147, 149 (Mo. banc 1989), holding that the prevailing party need not respond to points which need be reached only if there is a reversal. Simply because the Court feels that the plaintiff is not entitled to summary judgment, it does not follow that the defendant is so entitled.[20]

It is also stated that "ACLU made no claim in its petition for return of any portion of the salary paid defendant." The essence of the plaintiffs' claim was that the defendant violated his contract of employment by receiving additional compensation for legal services performed as a part of his employment. The plaintiffs are entitled to explore any aspect of that fact situation, and to amend to reach this result. *Wells v. Stinson, Mag & Fizzell*, 739 S.W.2d 706 (Mo. banc 1987); *Grandview Bank & Trust Co. v. Stinson, Mag & Fizzell*, 739 S.W.2d 707 (Mo. banc 1987). They should not be cast on summary judgment without being given the opportunity to amend their pleading to state a claim for recovery of salary, if that might be a viable claim.[21] The action should not be dismissed short of the trial stage if the pleadings state facts which might support recovery on any reasonable theory.[22]

At a later point the Court says, "we point out that D.C. is not a party to this action and we insinuate nothing as to his rights to the proceeds." The plaintiffs had an assignment from D.C., which gave them colorable authority to claim what he might be entitled to. The defendant made no point in the trial court of the absence of D.C. as a party, although he did object that ACLU/EM was not a party at the inception and that organization was later included as a party. If it is necessary to make D.C. a party, the plaintiffs should have the opportunity to do so.[23] It violates established procedural norms to put them out of court on summary judgment without giving them this opportunity.

The vice of the principal opinion with respect to the motion for summary judgment is highlighted by two particular passages, in which the defendant's late affidavit is apparently accepted uncritically. It states that the payment to the attorney was made according to the city's "standard procedure in such matters." The opinion simply lifts the bare language of the defendant's affidavit. Furthermore, I am unable to see what legal significance the city's "standard procedure" has. There is no explanation as to how the plaintiff can draw down the award personally when he was not entitled to it by the terms of the judgment, or how he could draw it down as an attorney when he was no longer an attorney in the case.

It is also said that "defendant offered to refund a proportional share of the salary." The only basis for this statement is an affidavit filed on the date of the hearing, stating the bare allegations that the opinion parrots. Nothing in the papers shows what amount was tendered, or the basis for computation. If this allegation has any significance, it is not sufficiently established by the affidavit. If the tender was made as an offer in compromise, then it is

---

**20.** *St. Charles County v. Dardenne Realty Co.*, 771 S.W.2d 828, 830 (Mo. banc 1989); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 244 (Mo. banc 1984);

**21.** *Offenbacker v. Sodowsky*, 499 S.W.2d 421, 427 (Mo.1973); *Jensen v. Estate of McCall*, 426 S.W.2d 52, 56 (Mo.1968); *Dietrich v. The Pulitzer Pub. Co.*, 422 S.W.2d 330, 334 (Mo.1968); *Boyd v. Kansas City Area Transp. Authority*, 610 S.W.2d 414, 416–17 (Mo.App.1980); *Koller v.*

*Ranger Ins. Co.*, 569 S.W.2d 372, 373 (Mo.App. 1978).

**22.** *See Frame v. Boatmen's Bank of Concord Village*, 782 S.W.2d 117 (Mo.App.1989).

**23.** *Rule* 52.06; *Rule* 52.04; *Daiprai v. Moberly Fuel & Transfer Co.*, 359 Mo. 789, 223 S.W.2d 474 (Mo.1949); *Kiefer v. First Capitol Sports Center, Inc.*, 684 S.W.2d 483, 488 (Mo.App.1984); *Humphrey v. Humphrey*, 639 S.W.2d 269, 270 (Mo.App.1982).

clearly not admissible against either the offeror or the offeree, under established legal standards.[24] If the point is that the defendant has tendered all that the plaintiffs are claiming, then why are the plaintiffs not entitled to some recovery based on a portion of the salary paid the defendant? If they are entitled to anything, then the Court improvidently entered summary judgment for the defendant.

Footnote 1 concludes by saying that "the decision does not determine the so-called 'ethical conduct' of the defendant to which the dissent alludes." The defendant's conduct stands out on the face of the record. The principal opinion, by directing summary judgment for the defendant, necessarily places its stamp of approval on the defendant's conduct, and holds that the plaintiff is without remedy on account of this conduct. Why this deliberate closing of the eyes? *Cf. Sprung v. Negwer Materials, Inc.*, 775 S.W.2d 97 (Mo. banc 1989); *Sprung v. Negwer Materials, Inc.*, 727 S.W.2d 883 (Mo. banc 1987).

The summary judgment for the defendant violates established procedural norms. It will rise to haunt us in years to come, in sundry cases. Even if the Court concludes that the summary judgment for the plaintiff is infirm, the case should be remanded for further proceedings. A plaintiff who is successful in the trial court should not be summarily turned out on appeal without being provided the opportunity to explore alternatives on remand. *Moss v. National Super Markets, Inc.*, 781 S.W.2d 784, 786 (Mo. banc 1989).

### Conclusion

I would affirm the judgment. Even if the majority is not so disposed, the proper course is to reverse and remand for further proceedings.

---

**24.** *Jacobs v. Danciger*, 344 Mo. 1042, 130 S.W.2d 588, 592 (1939); *Kelsey v. Kelsey*, 329 S.W.2d 272, 274 (Mo.App.1959).